# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| HEMLOCK SEMICONDUCTOR, L.L.C. AND HEMLOCK SEMICONDUCTOR CORP. ) ) ) ) | |
| Plaintiffs, ) ) ) | |
| v. ) ) | Civil No. 3:15-cv-664<br>Judge Sharp |
| SUMMIT PROCESS DESIGN INC. AND BRUCE HAZELTINE ) ) ) ) | |
| Defendants. ) | |

## MEMORANDUM

Plaintiffs Hemlock Semiconductor, L.L.C. and Hemlock Semiconductor Corp. (together, "Hemlock") sued Defendants Bruce Hazeltine and Summit Process Design, Inc., alleging misappropriation of trade secrets. (Docket No. 99.) The parties met to discuss settlement on June 24, 2015; Defendants now move to enforce a settlement agreement that the parties reached that day. (Docket No. 72.) For the following reasons, the Court will grant Defendants' Motion.

## BACKGROUND

### I.  Underlying Suit

Hemlock is a Delaware corporation based in Midland, Michigan. (Docket No. 99, p. 2.) Hemlock produces polycrystalline silicon, a central component in semiconductor devices and solar cells. (Id. at 3.) Defendant Bruce Hazeltine is a citizen of Montana and a former Hemlock employee. (Id. at 2.) Hazeltine owns Defendant Summit Process Design, Inc., a Montana corporation that offers consulting services to companies that produce polycrystalline silicon. (Id.)

1

Polycrystalline silicon's quality is measured by its purity. Low-purity silicon is used to produce solar cells that convert solar energy into electrical current, while high-purity silicon is the base material for silicon wafers that are in manufactured electronic devices. Hemlock produces ultra-high-purity polycrystalline silicon. (Id. at 4.) It holds itself out as "a global leader" among polycrystalline silicon suppliers and claims that "[n]early one in three electronic devices in the world contains ultra-high-purity polycrystalline silicon from Hemlock." (Id.)

Hemlock attributes its market position to its protected specialized knowledge, unique technology, trade secrets, and closely-guarded production methods. (Id.) In light of this, Hemlock has gone to great lengths to ensure the secrecy of its processes. It requires all employees to sign strict confidentiality agreements that prohibit discussing the facilities' equipment, layout, or production methods. (Id. at 4–5.)

Between 2008 and 2012, Hemlock invested $1.2 billion to build a new facility in Clarksville, Tennessee. (Id. at 6.) The plant soon closed after market conditions threatened its profitability. (Id.) Still, Hemlock's management feared bigger losses if information about its production methods fell into the hands of competitors. (Id.) So rather than sell the plant to a competitor, Hemlock decided to demolish it. (Id.)

Hemlock first removed as much proprietary technology and material from the facility as possible. (Id. at 6–7.) It then hired a demolition company to destroy the remaining equipment and structures. (Id. at 7.) Hemlock hired D.H. Griffin Wrecking Company ("Griffin") to carry out the demolition, giving each Griffin employee restricted access to the facility. (Id.) Hemlock also gave Griffin permission to sell individual pieces of standard equipment—piping, electric cables, and wiring—that Hemlock had left behind. (Id.) That equipment remained in the facility during the demolition. (Id.)

A single piece of standard equipment is not confidential in and of itself. But the configuration of standard equipment—the way that the equipment is laid out and connected—is often highly proprietary. An outsider, particularly one with specialized knowledge, could gain access to sensitive trade secrets simply by observing how standard equipment is set up in a facility.

Hemlock claimed that Hazeltine did exactly that. (Id. at 11.) Hemlock alleges that, in May 2015, Hazeltine and others travelled to the Clarksville plant and entered restricted areas. Once at the site, Hemlock claims, Hazeltine "entered buildings that were off-limits to visitors" and took photos and video of "production equipment laid out in proprietary configurations." (Id. at 9.) He allegedly spent 10 hours recording the features of the Clarksville plant. (Id.)

Hemlock brought this suit in June 2015, alleging misappropriation of trade secrets and confidential business information against Hazeltine. (Id. at 10–11.)

## II.     Settlement Negotiations

On June 24, 2015, Hemlock's lead counsel approached Defendants' counsel with a suggestion that the parties settle. (Docket No. 77, p. 1.) Defendants agreed, and the parties reached a tentative settlement agreement that evening. (Docket No. 77, p. 2.) The parties gathered in a conference room and, with the Court Reporter present, read the agreement into the record. (Docket No. 77, p. 2.) They called their agreement a "Confidential Memorandum of Understanding" ("MOU"). (Docket No. 78-1, p. 1.)

The MOU contains fifteen terms. Two of those terms are particularly relevant for present purposes. First is the MOU's a mutual no-fault stipulation, which states that "discovery in this case has shown that Defendants have done nothing improper." (Docket No. 78-1, p. 2.) The

second is the stipulation that "the parties will enter into full and mutual releases." (Docket No. 78-1, p. 2, 10.)

On the record, the parties stated that the MOU was to be understood as "a framework for basic points that the parties have discussed and with which we believe we have agreement.'" (Docket No. 78-1, p. 1.) They indicated that they planned to put the MOU into writing later and agreed that certain provisions might be worded differently in the written version—the "language [would be] subject to further clarification and honing." (Docket No. 78-1, p. 16.) But they emphasized that the MOU was "intended to be [a] memorialization that captures [the parties'] intent." (Docket No. 78-1, p. 16.)

On June 25, the parties notified the Court that they had reached a settlement. The next day, the parties jointly moved for the Court to extend the temporary restraining order. (Docket No. 34.) The Court granted that motion. (Docket No. 40.)

Hemlock's lead counsel then circulated a written draft of the settlement agreement. (Docket No. 78-2.) By and large, the draft tracked every point of the MOU that had not yet been carried out. (Id.) It contained a no-fault stipulation, which stated that "[d]iscovery shows [that] defendants were invited to" visit the Clarksville facility during the demolition, and that, "without fault of their own," Defendants "received Hemlock confidential information." (Docket No. 78-2, p. 1.) It also included a fairly detailed mutual-release provision, which stated that the parties would "fully release" one another for any liability, "whether [the liability was] known or unknown" at the time of the agreement. (Docket No. 78-2, pp. 6–7.) The release did not apply to "any obligations arising after the execution of" the agreement. (Docket No. 78-2, p. 7.)

Between July 8 and July 10, the parties circulated several more drafts. In each of these drafts, there were no objections to the paragraph requiring a no-fault stipulation and the

paragraph outlining the parties' mutual releases.  (See Docket No. 78-4.)  The mutual-release provision's language from the June 26 draft—releasing the parties from all liabilities, "known or unknown"—was unchanged.  (Docket No. 78-4, pp. 8–9.)  Andrew Bagley, Hemlock's counsel, told Defendants' counsel that Hemlock would read through the July 10 draft agreement.  (Docket No. 74, ex. D.)  Bagley mentioned that Hemlock "will insist on certain formal trappings" and might "modify its structure."  (Docket No. 74, Ex. D.)  Bagley did not say that these edits would make any material changes to the agreement's provisions.  (Docket No. 74, Ex. D.)

Hemlock sent Defendants a new draft agreement on August 11.  (Docket No. 78-6.)  Hemlock's edits were largely organizational; for the most part, Hemlock had simply rearranged the order of terms in the contract without changing the terms themselves.  But the new draft did include a significant change to the mutual-release provision.  In the June and July drafts, the agreement would have released Defendants from all claims arising out of the dispute, "whether known or unknown."  (Docket No. 78-4, p. 8.)  The August 11 draft, however, specified that the release "shall not apply to obligations or violations of law that are not known as of the execution of this Agreement."  (Docket No. 78-6, p. 15.)

Hemlock also circulated a new draft permanent injunction on August 11 (Docket No. 78-7).  The new draft, unlike previous versions, stated that Hazeltine had entered the Clarksville facility without Hemlock's knowledge.  (Docket No. 78-7, p. 1.)  To Defendants, the new draft seemed to justify Hemlock's decision to seek a temporary restraining order against Defendants.  (See Docket No. 77, p.8.)  Defendants believed that this injunction would contradict the no-fault stipulation in the previous draft agreements.  (Id.)

Negotiations broke down shortly after Hemlock sent out the August 11 draft.  On October 28, Defendants filed a Motion to Enforce the MOU.  (See Docket No. 76.)

**LEGAL STANDARD**

A district court has the inherent power to enforce a settlement agreement between parties in litigation. Bamerliease Capital Corp. v. Nearburg, 958 F.2d 150, 152 (6th Cir. 1992); Brock v. Scheuner Corp. 841 F.2d 151, 154 (6th Cir. 1988). A court can exercise this power "even if that agreement has not been reduced to writing." Bowater N. Am. Corp. v. Murray Mach., 773 F.2d 71, 77 (6th Cir. 1985). Once formed, a settlement agreement is "binding, conclusive, and final as if it had been incorporated into a judgment." Bostick Foundry Co. v. Lindberg, 797 F.2d 280, 282–83 (6th Cir. 1986).

Summary enforcement is appropriate when there are no substantial disputes about the facts surrounding the settlement agreement. RE/MAX Int'l, Inc. v. Realty One, Inc., 271 F.3d 633, 646 (6th Cir. 2001). But before a court may enforce the agreement, it must conclude that the parties agreed on the agreement's material terms. The Glidden Co. v. Kinsella, 386 Fed. App'x 535, 540 (6th Cir. 2010); Bobonik v. Medina Gen. Hosp., 126 Fed. App'x 270, 273 (6th Cir. 2005). Where there are disputed facts related to a settlement agreement, a court should not summarily enforce the agreement. RE/MAX, 271 F.3d at 646.[1]

**ANALYSIS**

The crux of this dispute is whether the parties agreed to the material terms of the MOU on June 24. If so, then the MOU is enforceable, even if the parties intended to refine the agreement's language sometime later. Bobonik, 126 Fed. App'x at 273; Gurley v. King, 183 S.W.3d 30, 36–37 (Tenn. Ct. App. 2005). But if the MOU was merely an agreement in principle—to become effective only after the parties executed it—it is not enforceable. See, e.g., Toxco, Inc. v. Transchem, LLC, 42 Fed. App'x 712, 714 (6th Cir. 2002); Gen. Motors Corp. v.

---

[1] When there are factual disputes, a court should hold an evidentiary hearing. Bobonik, 126 F. App'x at 274. No hearing is needed when an agreement is unambiguous and there are no questions of fact. RE/MAX, 271 F.3d at 646.

Keener Motors, Inc. 194 F.2d 669, 676 (6th Cir. 1952) (With an agreement in principle, "the obligation to become binding rests on a future agreement to be reached by the parties, so that either party may refuse to agree, [and] there is no contract.").

Under Tennessee law,[2] a binding contract requires mutual assent between the parties. Allstate Ins. Co. v. Tarrant, 363 S.W.3d 508, 528 (Tenn. 2012). Mutuality of assent should be determined from the "parties' manifestations according to an objective standard." Moody Realty Co., Inc. v. Heustis, 237 S.W.3d 666, 674 (Tenn. Ct. App. 2007). And though a court may glean the parties' intent from their words, an objective assessment involves looking at more than merely "the words used." Scandlyn v. McDill Columbus Corp., 895 S.W.2d 342, 345 (Tenn. Ct. App. 1994). Instead, the court should consider "the situation, acts, and the conduct of the parties, and the attendant circumstances." Scandlyn v. McDill Columbus Corp., 895 S.W.2d 342, 345 (Tenn. Ct. App. 1994).

Looking at the facts under this standard, Hemlock and Defendants reached a binding settlement agreement on June 24. The parties both stated, on the record, that the MOU was meant to be "a memorialization that captures [the parties'] intent" and "a framework of basic points that the parties have discussed and with which [they] believe [they] have agreement." (Docket No. 78-1, pp. 1, 16.) Hemlock's attorneys sometimes interjected to clarify the meaning of a certain provision, but never expressly objected to any of the terms that were read into the record—including the provision that the "parties . . . enter a full and mutual release." (See Docket No. 78-1, p. 10.)

The parties also began performing under the terms of the MOU immediately after negotiations ended. On June 25—the day after they read the MOU into the record—they notified

---

[2] Because a settlement agreement is a contract, the formation and enforceability of a purported settlement agreement are governed by state contract law. Cuyahoga Valley Ry. Co. v. U.S. Bank Tr. Nat'l Ass'n, 515 Fed. App'x 494, 498 (6th Cir. 2013).

7

the Court that they had reached a settlement agreement. (See Docket No. 79, p. 18.) That notice carried out the fourteenth provision of the MOU, which required the parties to "communicat[e] with the Court concerning the status of the case, settlement discussions, and postponing" the injunction and discovery deadlines. (Docket No. 78-1, p. 15.) And on June 26, both parties jointly moved for the Court to extend the temporary restraining order. (Docket No. 34.) That motion carried out the thirteenth provision of the MOU, which called for the "[p]arties [to] enter into a joint motion to extend the existing TRO . . . until the full settlement agreement is signed." (Docket No. 78-1, p. 15.) Both actions show that the parties intended to be bound by their June 24 agreement, since it is well-settled that mutual assent to contract terms can be established by a party's partial performance. Jones v. LeMoyne-Owen Coll., 308 S.W.3d 894, 905–06 (Tenn. Ct. App. 2009). See also, e.g., Kaltreider v. Simmons, 2015 WL 546853, at *3 (M.D. Tenn. Sept. 15, 2015); Gurley v. King, 183 S.W.3d 30, 41 ("Part performance under an agreement may remove uncertainty and establish that a contract enforceable as a bargain has been formed.") (quoting RESTATEMENT (SECOND) OF CONTRACTS, §34(2) (2016).)[3]

Still, Hemlock argues that it never agreed to be bound by the MOU on June 24. First, it contends that there was never a meeting of the minds on the scope of the MOU's mutual-release provision, which was a material term of the agreement. (See Docket No. 78-1, p. 10.) And second, it argues that the MOU was meant only as an "agreement in principle" that would

---

[3] The context of the negotiations also shows that the June 24 MOU was intended to be final. When the negotiations began on June 24, a few deadlines loomed: The parties had scheduled two depositions between June 24 and June 26. (Docket No. 79, p. 2.) And a June 23 Court order gave Hemlock until 5 p.m. on June 24 to produce eleven categories of documents, including those outlining the "policy and protocols for preservation of trade secrets" at the Clarksville sites. (Docket No. 31, p. 2.) Neither party fulfilled its obligations after negotiating the settlement on June 24. This suggests that the parties—particularly Hemlock, which knowingly disregarded a court-ordered discovery obligation—believed that their settlement agreement was effective and that the dispute had been resolved.

become enforceable only after the parties signed a more detailed written agreement. (Docket No. 87, pp. 9–10.)

Both arguments miss the mark. A release-of-claims provision is a material term of a settlement agreement, Michigan Regional Council of Carpenters v. New Century Bancorp, 99 Fed. App'x 15, 21 (6th Cir. 2004), so the parties would both need to agree to the mutual-release provision for the MOU to be enforceable. Yet that is exactly what happened. On June 24, the parties both agreed, on the record, to enter into "full and mutual releases." (Docket No. 78-1, p. 10.) It was only on August 11—nearly seven weeks after the MOU—that Hemlock changed that provision to cover "obligations or violations of law that are not known as of the execution of this Agreement." (Docket No. 78-6, p. 15.) Even if Hemlock believed that the mutual-release provision covered only claims that "[we]re not known" on June 24, it never expressed that understanding at any point in the negotiations. And Tennessee law requires that the Court interpret the MOU as it was stated on the record, rather than according to the unexpressed intention of one party. Nashville Elec. Supply Co., Inc. v. Kay Indus., Inc., 533 S.W.2d 306, 310 (Tenn. Ct. App. 1975).

This conclusion stands despite the parties' plan to put their agreement into writing sometime after June 24. When two parties form a contract, the contract is effective even if the parties also intend to prepare a written memorialization later on. Ballew v. Ballew, 2006 WL 709198, at *6 (Tenn. Ct. App. Mar. 22, 2006). This rule is laid out in § 27 of the Restatement (Second) of Contracts, which states that "[m]anifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so operating by the fact that the parties also manifest an intention to prepare and adopt a written memorial thereof." RESTATEMENT (SECOND) OF CONTRACTS, §27 (2016). See also, e.g. Conner v. Hardee's Food

Sys., Inc., 65 Fed. App'x 19, 23 (6th Cir. 2003) (applying Tennessee law and relying on § 27); Ballew v. Ballew, 2006 WL 709198, at *3–4 (Tenn. Ct. App. Mar. 22, 2006) (relying on § 27 to find an enforceable contract notwithstanding a failure to execute a later memorialization); Gurley, 183 S.W.3d at 33, 38.

The Restatement clarifies the rule in an explanatory Comment:

> Parties who plan to make a final written instrument as the expression of their contract necessarily discuss the proposed terms of the contract before they enter into it and often, before the final writing is made, agree upon all the terms which they plan to incorporate therein. This they may do orally or by exchange of several writings. It is possible thus to make a contract the terms of which include an obligation to execute subsequently a final writing which shall contain certain provisions. If parties have definitely agreed that they will do so, and that the final writing shall contain these provisions and no others, they have then concluded the contract.

RESTATEMENT (SECOND) OF CONTRACTS § 27 cmt. a.

The exception to this rule comes only when "the circumstances . . . show that the agreements are preliminary negotiations." Id. Section 27's other two comments explain the exception to the rule. Comment b states that:

> [I]f either party knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist until other terms are assented to or until the whole has been reduced to another written form, the preliminary negotiations and agreements do not constitute a contract.

RESTATEMENT (SECOND) OF CONTRACTS § 27 cmt. b,

Hemlock points to nothing that would give Defendants "reason to know" that Hemlock's assent was conditioned on execution of a written agreement. For one thing, the parties never said anything to that effect in the MOU. No terms were expressly left undefined, nor were any provisions too imprecise to be enforceable. Cf. Healthmart USA, LLC . Directory Assistants, Inc., 2011 WL 1314662, at *4 (Tenn. Ct. App. Apr. 6, 2011) ("Contracts that leave material terms open for further negotiation are generally too vague to be enforceable.") Admittedly, the

10

terms at issue are not given much detail: the mutual-release provision states only that "the parties will enter into full and mutual releases," and the no-fault provision states that "the parties will enter into a stipulation of no fault." (Docket No. 78-1, pp. 2, 10.) Yet the purpose of those terms is fairly obvious. And even imprecise terms are enforceable if the parties' intent is clear. Urology Assocs., P.C. v. CIGNA Healthcare of Tenn., Inc., 2002 WL 31302922, at *8 (Tenn. Ct. App. Oct. 11, 2002) (holding enforceable an imprecise term that, though "hardly a model of clarity," was coherent enough to glean the intent of the parties).[4]

In the end, this is not a complicated issue. The parties negotiated a detailed settlement agreement on June 24. Each party assented to the terms of the agreement. And they read that agreement into the record, calling it "[a] memorialization that captures [the parties'] intent." (Docket No. 78-1, p. 16.) Their agreement was binding on June 24, regardless of Hemlock's insistence otherwise. See Remark, LLC, 702 F.3d at 283 ("[A] prior meeting of the minds is not undone by the decision of one party to back out of the last version, even if it is the most formal version, of a settlement agreement."); RE/MAX, 271 F.3d at 645 (6th Cir. 2001) ("When parties have agreed on the essential terms of the settlement, and all that remains is to memorialize the agreement in writing, the parties are bound by the terms of the oral agreement.").

---

[4] Hemlock also tries to argue that the MOU conditioned performance on executing a written agreement. (Docket No. 87, p. 9 n.4.) It points to four terms in the MOU that refer to a "a fully signed . . . agreement," or (a "signed agreement between the parties") to set deadlines for document production, payment of attorney's fees, and extending a temporary restraining order. (Docket No. 78-1, pp. 5, 6, 14, 15.)

But the cited provisions never *condition* performance on an executed settlement agreement; those provisions merely *schedule* performance to take place sometime after the document was signed. As such, they are not material terms of the agreement, but mere "reference point[s]" for the dates upon which the parties would perform under the agreement. Remark, LLC v. Adell Broad. Corp., 702 F.3d 280, 284 (6th Cir. 2012) (finding that a provision stating that a settlement agreement would be "effective as of the date the parties sign the agreement" was "unexceptional language" and "not a material term").

The settlement agreement should be enforced.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE